# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| TRISTAR INVESTORS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 3:12-cv-0499-M |
| | § | |
| AMERICAN TOWER CORPORATION, | § | |
| AMERICAN TOWERS LLC, AMERICAN | § | |
| TOWERS INC., AMERICAN TOWER | § | |
| GUARANTOR SUB, LLC, AMERICAN | § | |
| TOWER HOLDINGS SUB, LLC, | § | |
| AMERICAN TOWER ASSET SUB, LLC, | § | |
| AMERICAN TOWER SUB II, LLC, | § | |
| AMERICAN TOWER MANAGEMENT, | § | |
| LLC, AMERICAN TOWER L.P., and | § | |
| SPECTRASITE COMMUNICATIONS, LLC, | § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM OPINION & ORDER</u>

Before the Court are the Motion for Partial Summary Judgment filed by Plaintiff TriStar

Investors, Inc. ("TriStar") [Docket Entry #235], the Motion for Partial Summary Judgment filed

by Counter-Defendants David Ivy, Ed Wallander, Robert Giles, Dale Gilardi, Jerry Vogl, John

Lemmon, Michael Mackey, and Matt Newton (collectively, the "TriStar Individuals") [Docket

Entry #238], and the Motion for Partial Summary Judgment filed by Defendants American

Tower Corporation, American Towers LLC, American Tower, LLC, American Towers, Inc.,

American Tower Guarantor Sub, LLC, American Tower Holding Sub, LLC, American Tower

Asset Sub, LLC, American Tower Asset Sub II, LLC, American Tower Management, LLC,

American Tower, L.P., and SpectraSite Communications, LLC (collectively "ATC") [Docket

Entry #241]. For the reasons stated below, TriStar's Motion is **GRANTED** in part and **DENIED**

in part; the TriStar Individuals' Motion is **GRANTED**; and ATC's Motion is **GRANTED** in part

and **DENIED** in part.

# I.    FACTUAL BACKGROUND

Cellular phone service is provided through antennae installed on cellular communication towers. While some of those towers are owned and operated by wireless carriers[1] most are operated, and sometimes owned, by tower companies.[2] Tower companies derive revenue by charging rent to wireless carriers to locate equipment on their towers. TriStar's MSJ, App. TS7-8. The majority of the cell towers in the United States are located on property leased[3] by carriers or tower companies from individual landowners, for a specific period of time, for monthly rent. Tower companies either own the towers or lease and then sublease them to carriers.

Plaintiff TriStar is a private company of about forty employees, founded in 2005. TriStar's MSJ, App. TS8 (Mackey Decl. ¶ 4). TriStar's business model is to acquire interests in land under cell towers, usually in the form of an easement, generally by offering the landowner a percentage of the rent paid by the carrier to TriStar. Second Am. Compl. ¶ 46–47. TriStar will take over operation of those towers upon the expiration of the incumbent tower operator's property interest. TriStar's MSJ, App. TS18 (Mackey Dep. 20:6-12); TS8 (Mackey Decl. ¶ 6). TriStar's goal is to acquire land rights under the best cell towers, *i.e.*, those that generate the most revenue, because they host multiple tenants. Second Am. Compl. ¶¶ 45, 52. While there are some 135,000 cell towers in the United States, TriStar has a property interest in approximately 650 tower locations.[4] TriStar's MSJ, App. TS9 (Mackey Decl. ¶ 8); Second Am. Compl. ¶ 2; ATC's MSJ, App. 12.

---

[1] The largest wireless carriers include AT&T, Verizon, and T-Mobile.
[2] The parties are both involved in the operation of towers. Other companies operating towers include SBA Communications Corporation ("SBA") and Crown Castle International Corporation ("Crown").
[3] The property interest may be another type, such as an easement.
[4] As of August 11, 2013, the deadline for fact discovery, TriStar had closed transactions for 594 sites, and had 49 additional sites under agreements that had not yet closed.

Defendant ATC is a publicly traded company that operates approximately 22,800 cell tower sites in the United States. Answer to Second Am. Compl. ¶ 2; ATC's MSJ, App. 12. ATC rents space on its cell towers to wireless carriers, thereby generating a "chief source of [its] revenue." ATC's MSJ, App. 810. ATC pays the landowner monthly rent for its land rights. In other words, ATC's rights to operate cell towers arise from its possession of subservient legal interests[5] in the land on which its towers stand. ATC asserts that the cost for it to secure and exercise such property rights typically represents a significant portion of its expenses to operate cell towers. ATC's MSJ, App. 3279–81 (¶¶ 6–7), 15–17. When ATC's property interest expires, it can negotiate an extension, attempt to buy the land or an easement, or give up its rights to operate the tower, at least on that site. Answer to Second Am. Compl. ¶ 35–36. The cell tower sites are interrelated and are part of a network to provide reliable cell coverage. Moving a tower may disrupt the network. TriStar's MSJ, App. TS225.

By August 11, 2013, TriStar had acquired property rights, usually in the form of easements,[6] in land on which 594 cell towers currently or formerly operated by ATC were located. TriStar's MSJ, App. TS9 (Mackey Decl. ¶ 8). TriStar paid approximately $50 million, or $85,000 per site, for these property rights, which allow TriStar to operate cell towers on these sites when ATC's current leases expire. TriStar's MSJ, App. TS9, TS256-58. TriStar agreed with the landowners to share a negotiated percentage of the revenue generated by it in operating the cell towers (typically between 40% and 50%) with the landowners. TriStar's MSJ, App. TS9 (Mackey Decl. ¶ 6). TriStar presently operates twenty-five towers previously operated by ATC. TriStar's MSJ, App. TS9 (Mackey Decl. ¶ 9). The annual costs of operating a tower site range

---

[5] Examples are a leasehold, easement, or similar property interest.
[6] Given that most of the property rights that TriStar acquired were easements, the Court will refer to those rights collectively as "easements", even though TriStar also acquired other property interests.

from $5,000 to $6,000, with annual revenues ranging from $40,000 to well over $100,000 for multi-tenant towers. TriStar's MSJ, App. TS815. ATC reported an 82% gross profit margin in 2012, while TriStar reported a gross profit margin of 55%. TriStar's MSJ, App. TS797–98, TS10 (Mackey Decl. ¶ 9).

TriStar entered into "Standstill Agreements" with SBA in March 2009, and with Crown in March 2010, by which TriStar agreed, among other things, not to seek property rights in the land under cell towers owned or controlled by SBA and Crown. ATC's MSJ, App. 325–33, 551–60. These Standstill Agreements were related to Stock Purchase Agreements, by which SBA and Crown purchased 10% and 14%, respectively, of TriStar stock. Countercl. ¶¶ 76, 90. ATC alleges that these agreements and TriStar's business model constitute an anticompetitive scheme to pay "supra-competitive" prices for property rights at ATC tower sites, thus raising ATC's costs to acquire future property rights, in the hopes that ATC would ultimately pay TriStar for a similar standstill agreement. ATC's MSJ, App. 573–75.

ATC alleges that the funds TriStar gained from the Standstill Agreements enabled it to expend more resources, which allowed it to acquire easements at 594 ATC sites. ATC's MSJ, App. 573–75; ATC's Opposition to TriStar's MSJ, App. I 277 ¶ 3. The Standstill Agreements also resulted in TriStar not seeking to acquire property rights at sites underneath SBA and Crown towers, almost 800 of which are on land owned by ATC. ATC's Opp. to TriStar's MSJ, App. I 479 ¶¶ 16–17. In response to TriStar's strategy, particularly its purchase of easements at sites where ATC operated towers, ATC began to be more proactive in seeking to acquire property interests[7] for itself at its tower sites in order to control the use of the site after its current leases expired, and explored opportunities to move its towers or relocate its tower tenants to

---

[7] Typically easements.

neighboring ATC towers. ATC's MSJ, App. 2718–20, 2696–97. TriStar asserts that in seeking these arrangements, ATC and its representatives (1) made false and misleading statements to landowners; and (2) engaged in "sham litigation", all in an attempt to exclude TriStar from the market and to effectuate a monopoly. TriStar asserts that ATC used such tactics to secure future control at 2,944 sites where TriStar had made offers to landowners to acquire land rights under towers operated or formerly operated by ATC. ATC's MSJ, App. 831 (Report of Dr. Perryman, TriStar's damages expert).

## II.      LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a reasonable jury could return a verdict for the non-moving party, then there is a genuine dispute as to material facts. *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 417 (5th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Lynch Props., Inc. v. Potomac Ins. Co.,* 140 F.3d 622, 625 (5th Cir. 1998).

Once the movant carries its initial burden, the burden shifts to the non-movant to show that summary judgment is inappropriate, by designating specific facts beyond the pleadings that prove the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Anderson,* 477 U.S. at 250; *Fields v. City of S. Houston, Tex.,* 922 F.2d 1183, 1187 (5th Cir. 1991). In making that determination, "factual controversies are construed in the light most favorable to the non-movant, but only if both parties have introduced evidence showing that a controversy

exists." *Lynch Props.,* 140 F.3d at 625 (citation omitted). A party may seek partial summary judgment on liability issues while reserving the issue of damages or attorney's fees for another day. Fed. R. Civ. P. 56(a) (authorizing summary judgment on part of claims or defenses); *Trammell Crow Residential Co. v. Va. Sur. Co.,* 643 F. Supp. 2d 844, 849 n 4 (N.D. Tex. 2008) (Fitzwater, C.J.)

III.     **TRISTAR'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND ATC'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON ITS SHERMAN ACT SECTION 1 COUNTERCLAIM**

Both TriStar and ATC seek summary judgment on ATC's Sherman Act Section 1 counterclaim, and TriStar also seeks summary judgment on ATC's misappropriation of trade secrets, and tortious interference counterclaims. ATC also seeks summary judgment on its Sherman Act Section 1 counterclaim.

A.     **Sherman Act Section 1**

ATC alleges that TriStar violated Section 1 of the Sherman Act, by entering into the Standstill Agreements with SBA and Crown. ATC's Countercl. ¶¶ 133-35. Only a "person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" may recover for a violation of Sherman Act Section 1. 15 U.S.C. § 15 (1997). The Fifth Circuit has held that "[s]tanding to pursue an antitrust suit exists only if a plaintiff shows: (1) injury-in-fact–*i.e.*, an injury to the plaintiff proximately caused by the defendants' conduct; (2) antitrust injury; and (3) proper plaintiff status." *Doctor's Hosp. of Jefferson, Inc. v. Southeast Medical Alliance, Inc.,* 123 F.3d 301, 305 (5th Cir. 1997). The parties do not contest the third element–that ATC is a "proper plaintiff"–so the Court will analyze the other two elements of antitrust standing–injury-in-fact and antitrust injury.

### 1.      Injury-in-Fact

A court analyzing antitrust standing must first determine whether the plaintiff has

properly alleged an injury-in-fact to its business or property. *Norris v. Hearst Trust,* 500 F.3d

454, 465 (5th Cir. 2007). ATC argues that it was injured by the Standstill Agreements as a tower

operator seeking interests in property under towers, in competition with Crown, SBA, and

TriStar, and as an owner of land under SBA and Crown towers.[8]

ATC argues that it was injured as a competitor of Crown, SBA, and TriStar for property

rights because the Standstill Agreements removed TriStar as a rival competing for sites under

SBA and Crown towers, thereby lowering the costs for SBA and Crown, competitors to ATC, to

obtain property rights. ATC cannot show that it suffered an antitrust injury-in-fact because, even

if the Standstill Agreements restrained trade, ATC benefited, rather than suffered harm, from a

reduction in the number of bidders for land rights, in the same manner it alleges SBA and Crown

did—namely the prospect of incurring lower costs for property rights because of the presence of

fewer competitors in the market to bid up prices. In *Matsushita Electric Industrial Co., Ltd. v.

Zenith Radio Corp.*, 475 U.S. 574, 583 (1986), the Supreme Court found that if Japanese

electronics companies conspired "to impose nonprice restraints that have the effect of . . . raising

[the] market price[,]" their American competitors could not recover any damages because, as

competitors, they "st[ood] to gain" from such a conspiracy. The Supreme Court found that such

American competitors lacked standing because "non-price restraints . . . though harmful to

competition, actually *benefit* competitors." *Id.* (emphasis in original). Here, ATC similarly

cannot support a claim that it was injured as a competitor for property rights, because if the

---

[8] As of October 24, 2013, ATC owned 564 sites where it leased the right to operate a cell tower to Crown, and 226 sites where it leased the right to operate a cell tower to SBA. ATC's Opp. to TriStar's MSJ, App. 479 (Maggio Decl. ¶¶ 16-17).

Standstill Agreements reduced the number of potential acquirers of land rights, its own costs to obtain such rights could be expected to go down as there would be fewer bidders to drive up the price of those land rights.

ATC further argues that it was injured as a landowner because, by agreeing with SBA and Crown not to seek property rights at any of the roughly 800 SBA and Crown tower sites where ATC owns the land, TriStar has restrained the market for property rights to the detriment of ATC and all other landowners who lease to SBA and Crown. TriStar's MSJ, App. TS345 (¶ 12), 350 (¶ 21); ATC's Opp. to TriStar's MSJ, App. 293-94 (¶ 31 n.59); 769-770. ATC did not plead such an injury in its antitrust counterclaim, which asserts that it was injured only as a competitor for property rights, not as an owner of property. *See* Countercl. ¶¶ 95, 100, 135-36. ATC's expert has not quantified such an injury in his report. TriStar's Opp. to ATC's MSJ, App. 2016 (Besen Dep. 75:6-22) (conceding that at the time Dr. Besen submitted his report, he did not have any facts showing an actual reduction of payments to ATC for land rights for sites under Crown and SBA towers). ATC, thus, has not properly pled or supported such an injury. *See El Aguila Food Prods., Inc. v. Gruma Corp.*, 131 F. App'x 450, 453 (5th Cir. 2005) (affirming summary judgment for defendants on antitrust claims because the plaintiff's damages expert testimony "was not in any respect anchored to the specific agreements or marketing practices challenged by plaintiffs"); *Better Bags, Inc. v. Illinois Tool Works, Inc.*, 939 F. Supp. 2d 737, 749 (S.D. Tex. 2013) (granting summary judgment and excluding portions of expert report that raised arguments not contained in plaintiff's patent invalidity contentions).

Further, regardless of the procedural issues with ATC's claim of injury as a landowner, the summary judgment evidence reflects that ATC would not have done business with TriStar even if it had been a bidder for property interests in land owned by ATC, so its presence or

absence in the bidding process would, by ATC's own account, seemingly have no impact on ATC as a landowner. Tr. Hr'g Mots. Summ. J., Dec. 16, 2013, 66:24-67:25 ("We wouldn't deal with TriStar . . . . what [ATC] has said is that we don't want any part of the fraud that you're committing . . . ."). In other words, ATC cannot point to the Standstill Agreements as the cause of TriStar's absence as a potentially successful bidder for property rights at sites owned by ATC, because ATC effectively removed TriStar as a purchaser of such rights by refusing to deal with TriStar. It was ATC's own policy, not the Standstill Agreements, that ensured TriStar's absence, from the market for property inputs under Crown and SBA towers. Although ATC argues it *would* have done business with TriStar had it not been engaged in an allegedly fraudulent scheme, this argument renders any claimed injuries too speculative to constitute injury-in-fact. *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003) (finding that "unsupported speculation [is] not sufficient to defeat a motion for summary judgment"). ATC cannot demonstrate, with anything but rank speculation, any injury to itself because TriStar was not a bidder on the SBA and Crown sites after the Standstill Agreements were executed. The amount TriStar would have bid, had it bid, and who, if anyone, would have matched or beat the bid, is wholly speculative.

### 2.      Antitrust Injury

ATC also argues that it was injured because the Standstill Agreements gave TriStar a "multi-million dollar war chest" that allowed TriStar to overbid against ATC on other sites, all for the purpose of convincing ATC to purchase "protection" from TriStar in a form similar to the Standstill Agreements. TS 349 (¶¶ 18-19), TS373 (¶¶ 68 n.97); ATC's Opp. to TriStar's MSJ, App. 880-81 (76:17-77:6). However, even if ATC were injured in this manner, it is not the type of injury the antitrust laws were designed to prevent.

To recover under Section 1 of the Sherman Act, the plaintiff must have suffered an "injury of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful." *Norris v. Hearst Trust,* 500 F.3d 454, 465 (5th Cir. 2007) (quoting *Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc.,* 429 U.S. 477, 489 (1977)). The injury should be "the type of loss that the claimed violations . . . would be likely to cause." *Brunswick,* 429 U.S. at 489; *L-3 Commc'ns Integrated Sys., L.P. v. Lockheed Martin Corp.*, No. 3:07-CV-0341-B, 2008 WL 4391020, at *3 (N.D. Tex. Sept. 29, 2008) (Boyle, J.). The focus is on the "conceptual bounds of antitrust injury," not the ultimate merits of the claim. *Doctor's Hosp. of Jefferson, Inc. v. Southeast Medical Alliance, Inc.,* 123 F.3d 301, 305 (5th Cir. 1997).

ATC argues that it has been injured as a tower operator in the same market as SBA and Crown, because the Standstill Agreements increased ATC's costs for property rights by "funding [TriStar]'s efforts to acquire property rights at ATC sites at supra-competitive prices." TriStar's MSJ, App. TS345 (¶¶ 11-12); ATC's Opp. to TriStar's MSJ, App. 874-75 (Besen Dep. 68:13-71:17). In particular, ATC contends that TriStar used the proceeds from the Standstill Agreements to fund an attempt to drive up ATC's costs in the hope of selling it "protection" from TriStar's conduct. ATC's MSJ, App. 573-75. ATC maintains that TriStar's conduct caused either an artificial increase in the price ATC had to pay for property rights at tower sites not protected from TriStar's bidding, or ATC's ceding those rights to TriStar.

ATC does not assert that it was harmed as a tower operator by a reduction in competition or any other allegedly anti-competitive effect of the Standstill Agreements, but only that it was harmed because the Standstill Agreements produced substantial funds for TriStar and that those funds aided TriStar to effectuate its scheme against ATC. To the extent ATC has been injured in this manner, such an injury does not fall within the conceptual bounds of antitrust injury, which

is reduced competition. *See Brunswick*, 429 U.S. at 487-89 (holding that allowing a claimant to recover for a loss where the only causal link is the claimant's presence in a market where anticompetitive activity has occurred would "divorce[ ] antitrust recovery from the purposes of the antitrust laws without a clear statutory command to do so"); *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. at 344 (1990) ("The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior."). ATC would have suffered the same injury had TriStar gained its funding from any type of illegal venture, or even had it obtained large loans or substantial investments to fund its property interest acquisitions. Further, ATC has not produced evidence to demonstrate a link between the funds TriStar obtained from the Standstill Agreements and any conduct by TriStar with respect to ATC. Indeed, ATC conceded that it can only infer such a connection. Tr. Hr'g Mots. Summ. J., Dec. 16, 2013, 76:2-7**.** ("I don't know that you can take a particular dollar and associate it with a particular dollar that has been paid.").

Thus, it was not a lack of competition between SBA, Crown, and TriStar and an ensuing decrease in competition in the market that allegedly injured ATC in its role as a tower operator. Instead, the alleged injury arose from funding to its competitor. If the Standstill Agreements are illegal under the antitrust laws, it must be because they reduced competition in some way. *Atl. Richfield Co.*, 495 U.S. at 344. ATC does not allege that it was damaged by a reduction in competition, merely that in exchange for agreeing to reduce competition, TriStar received a financial windfall it could then use to target ATC's interests. Even if this windfall arose from a contract that reduced competition, it is what TriStar chose to do with that windfall, not the reduction in competition, that supposedly harmed ATC. The Court, therefore, concludes that, even if the Standstill Agreements violated the antitrust laws, ATC's injury did not occur 'by

reason of" that which made [those agreements] unlawful[,]" and is thus not sufficient to support

standing. *Brunswick*, 429 U.S. at 488. ATC lacks standing to pursue its Sherman Act Section 1

counterclaim against TriStar.

At the hearing on the parties' Motions for Summary Judgment, the Court concluded that

the Standstill Agreements were not per se violations of Sherman Act Section 1, and that if the

court reached the merits of ATC's Sherman Act Section 1 counterclaim, the claim would be

analyzed on a rule of reason basis. However, the Court's conclusion that ATC lacks standing to

bring that counterclaim obviates the need for such an analysis. Therefore, TriStar's Motion is

**GRANTED**, and ATC's Motion is **DENIED**, on ATC's Sherman Act Section 1 counterclaims.

## B.     ATC's Trade Secret Counterclaim

To succeed on a claim for misappropriation of trade secrets, a claimant must show

"(1) the existence and ownership of a trade secret, (2) the breach of a confidential relationship or

improper discovery of a trade secret, (3) use or disclosure of the trade secret, and (4) damages to

the owner." *Heil Trailer Intern. Co. v. Kula*, 542 Fed. App'x 329, 332 (5th Cir. 2013) (per

curiam) (citing *Cuidado Casero Home Health of El Paso, Inc. v. Ayuda Home Health Care

Servs., LLC*, 404 S.W.3d 737, 744 (Tex. App.—El Paso 2013, no pet.)). ATC alleges that TriStar

tortiously misappropriated ATC's trade secrets by obtaining, during its property interest

negotiations with landowners, copies of 143 ATC lease agreements that contained pricing terms

and confidentiality provisions prohibiting disclosure to third parties. ATC asserts that it was

injured because due to TriStar's misappropriation of its trade secrets, it lost some lease

extensions and had to overpay for others. TriStar responds that ATC's lease terms are not trade

secrets, that the confidentiality provisions are unreasonable restraints on alienation, and that the

alleged misappropriation did not cause ATC any recoverable damages.

Notably, there are 143 different lease agreements at issue with respect to this claim. Even among the handful of leases the parties discussed in their briefing, there are substantial differences in the wording and scope of the confidentiality provisions contained therein. These differences and the practical impediments to the Court's ability to itself analyze the 143 agreements,[9] which are subject to different state laws, with minimal guidance from the parties, militate against the Court deciding this claim as a matter of law.

### 1.      The Existence of Trade Secrets

A trade secret is "information", including "a formula, pattern, compilation, program device, method, technique, or process," that (1) "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" and (2) "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Unif. Trade Secret Act (1985), § 1. The Fifth Circuit has held that generally, the existence of a trade secret "is properly considered a question of fact to be decided by the judge or jury as fact-finder." *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 150 (5th Cir. 2004) (quoting Restatement (Third) of Unfair Competition § 39 cmt. (1995)).

TriStar argues that these lease rates cannot be trade secrets because they are not the product of any formula, pattern, compilation, program, device, method technique, or process, but rather such rates are the product of arm's length negotiations between landowners and ATC, after a bidding contest with others. TriStar also asserts that ATC's lease terms are not trade secrets because they do not derive independent economic value from not being known or readily ascertainable, particularly in light of the fact that ATC does not include confidentiality

---

[9] The parties provided the Court with a CD containing each of the leases at issue. However, it is not the Court's responsibility to review each of these leases and determine the appropriate confidentiality provisions.

agreements in over 80% of its leases. TriStar's MSJ App. TS38-39 (Hirsh Deposition 236:9-237:15).

ATC responds that pricing terms can be trade secrets. *See, e.g.*, *Apple, Inc. v. Samsung Electronics Co., Ltd.*, No. 11-CV-01846-LHK, 2013 WL 3958232, at *3 (N.D. Cal. Jul. 29, 2013) (holding that "pricing terms, royalty rates, and minimum repayment terms of licensing agreements plainly constitute trade secrets . . . ."). Further, ATC adduces evidence that TriStar implicitly conceded that the price information protected by the confidentiality agreements had independent value because TriStar conditioned its willingness to bid for property rights on the landowner's disclosure of that information. Countercl. ¶¶ 37, 292-94; TriStar's MSJ, App. TS447 (¶ 229 n.359). In particular, ATC presents evidence that TriStar had a policy that it would not make an offer for a property until after it had obtained a copy of the existing lease, which would include price terms. ATC's Opp. to TriStar's MSJ, App. 599-604, 613-16. ATC also presents evidence that TriStar attempted to obtain all the information it could on existing leases, as demonstrated by its conducting thorough research of the available public information, and notes that the non-public price terms would greatly inform the financial terms on which TriStar would negotiate with landowners. ATC's MSJ, App. 253, 418-36. ATC argues that the price terms were especially valuable to TriStar because that information enhanced TriStar's ability to acquire assets to the detriment of ATC, its competitor. *See Appalachian Railcar Servs., Inc.*, 602 F. Supp. 2d 829, 853 (W.D. Mich. 2008) (holding that internal pricing information could be economically valuable to a competitor because the competitor "could use knowledge of the pricing information to craft a bid that would have a better chance of winning [a] contract").

The Court concludes that there is a genuine issue of material fact as to whether 143 or fewer of the lease rates in ATC leases qualify as trade secrets. The contracts differ in their

definitions of "proprietary information" such that, at best, it is unclear whether pricing information is included within the definition. The record is inadequate for the Court to resolve, as a matter of law, the extent to which such provisions are trade secrets. *See, e.g.*, ATC's Opp. to TriStar's MSJ, App. 226, 251-52. The Court is skeptical that ATC will ultimately establish as a matter of fact that the price terms in the 143 leases were trade secrets, particularly when ATC inherited some of the contracts when it acquired tower sites from other companies,[10] and when it had many leases where price terms were not treated as confidential. Tr. Hr'g Mots. Summ. J., Dec. 16, 2013, 101:11-102:17.

### 2. Validity of Confidentiality Provisions

TriStar further argues that even if the pricing terms were trade secrets, the confidentiality provisions in ATC's leases are unenforceable as impermissible restraints on alienation. In asserting this affirmative defense to ATC's trade secret counterclaim, TriStar has the burden of proof. Fed. R. Civ. P. 8(c); *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002). TriStar maintains that ATC is attempting to use its confidentiality provisions to restrain the conveyance of property interests, rather than to protect purportedly confidential information, by restricting the ability of landowners to convey interests in their land because they cannot disclose the terms of an existing lease to prospective purchasers or lenders. TriStar's MSJ, App. TS517-27. ATC urges that its confidentiality clauses prohibit only the transfer of information, not the transfer of rights to real property, and that since these clauses are effective for finite periods of time, expire with the leases in which they are found, and that landowners are free to sell their property or interests therein subject to the terms of the lease, such clauses are not void as a matter of law.

---

[10] The issue of ATC's succession to leases with confidentiality terms and how that would impact the trade secret claim has not been briefed by the parties.

Because the Court does not have before it sufficiently clear arguments and evidence as to the provisions in each of the 143 leases, the Court does not find the confidentiality provisions invalid as a matter of law. *See, e.g.*, ATC's Opp. to TriStar's MSJ, App. 202, 226, 251-52. At least some of these leases permitted landowners to seek permission from ATC to disclose the details of the leases, including price terms, if such disclosure was necessary for the landowner to make a conveyance, and there was no evidence that such permission was ever sought and denied. Tr. Hr'g Mots. Summ. J., Dec. 16, 2013, 103:14-104:17; *see, e.g.*, ATC's Opp. to TriStar's MSJ, App. 202.

*Hoffman v. L & M Arts*, 774 F. Supp. 2d 826 (N.D. Tex. 2011) (Fitzwater, C.J.), is instructive as to this counterclaim. In *Hoffman*, the confidentiality clause at issue required the defendant to make "maximum effort to keep all aspects of [a previous] transaction confidential indefinitely." *Id.* at 830. The confidentiality clauses at issue were not limited by provisions allowing disclosure with permission, and the confidentiality obligation went on indefinitely. The *Hoffman* court held that "under the court's determination of the confidentiality provision as a matter of law, the provision does not have the effect of indirectly restraining alienation." *Id.* at 840. While that confidentiality provision likely impeded some sales, the court in *Hoffman* held that even though "a confidentiality provision may burden the buyer's ability to resell what he has purchased" the court could not conclude that the "provision qualifie[d] . . . as a 'restraint on alienation.'" *Id.* at 841. Here, ATC asserts that its confidentiality clauses have limited terms and permit disclosure, with ATC's consent. This Court finds the confidentiality provisions in issue do not, as a matter of undisputed fact and law, unreasonably restrain alienation.

### 3.      Damages

A party must prove damages with "reasonable certainty based upon objective facts, figures, or data from which the amount can be ascertained[.]" *Cuidado Casero Home Health of El Paso, Inc. v. Ayuda Home Health Care Services, LLC*, 404 S.W.3d 737, 744 (Tex. App.—El Paso 2013, no pet.). TriStar argues that its alleged misappropriation of trade secrets did not cause any recoverable damages to ATC. ATC presents evidence that TriStar improperly obtained pricing information for 143 ATC sites that had leases with confidentiality restrictions, and that it lost profits on those sites because ATC lost business to TriStar or had to pay higher rates to obtain lease extensions to defeat TriStar's efforts. ATC's MSJ, App. 29-30; TriStar's MSJ, App. TS421-22, TS447-448. TriStar asserts that ATC has no evidence that TriStar's alleged misappropriation of trade secrets proximately caused such damages. *See* TriStar's MSJ 31-32, App. TS448 (Besen Report ¶ 230 n.360).

ATC presents evidence that TriStar's own documents show that even when TriStar bids unsuccessfully for ATC sites, it substantially increases ATC's costs per site, and that when it loses such sites to TriStar, ATC loses approximately $1.7 million per site. ATC's MSJ, App. 29-30, 748-55. ATC further argues that possession of its confidential lease rate information gave TriStar a bidding advantage, and that without that advantage, ATC's property rights at these sites it lost would have been renewed and for those that were renewed, at a lower rate. ATC claims a 95% renewal rate when TriStar did not have ATC's allegedly confidential information, and a substantially lower rate when it did. ATC's MSJ, App. 3280 (¶ 8).

TriStar also argues that ATC cannot prove any damages because if consent from ATC to the landowners to disclose the lease rates had been sought, ATC would have either refused to consent, resulting in an an unreasonable restraint on alienation, or ATC would have consented to

the disclosure, thus negating the possibility of any damages to ATC, and rendering irrelevant that TriStar allegedly obtained this information in violation of the confidentiality provisions. ATC responds that the consent provisions, if they had been satisfied, would in any case have given ATC notice that it had a potential competitor in the transaction, which would have enhanced its ability to compete, and that the absence of such notice put it at a competitive disadvantage. ATC's expert offered a calculation of the damages that ATC incurred as a result of TriStar's alleged trade secret misappropriation based on his review of what happened at the 143 sites in issue. At forty-six sites, ATC actually lost land rights to TriStar, and at 97 other sites ATC retained property rights after TriStar obtained its pricing information by paying the landowners more than it allegedly would have had to pay but for TriStar's allegedly unlawful conduct. TriStar's MSJ, App. TS447 (Besen Report). The Court concludes that there is an additional fact issue as to how or whether ATC would have been successful in keeping sites it lost, or in reducing the amount it paid, had it received contractual notice by way of a request for consent, that a competitor was able to obtain its lease rates, where that provision was in the lease agreement. TriStar's Motion is **DENIED** as to ATC's trade secret counterclaim.

## C.     ATC's Tortious Interference Counterclaims

### 1.     Tortious Interference with Contract

The elements of tortious interference with a contract are: "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss." *Prudential Ins. Co. of Am. v. Fin. Review Services, Inc.*, 29 S.W.3d 74, 77 (Tex. 2000). ATC asserts that TriStar tortiously interfered with its contracts by obtaining copies of lease agreements that were subject

to confidentiality provisions and by bidding on and obtaining easements on ATC sites where the leases had non-interference and/or right of first refusal provisions in these agreements.

ATC presents evidence that TriStar solicited landowners to disclose ATC leases to TriStar, tortiously interfering with ATC contracts, business relationships, and expectancies. ATC's Opp. to TriStar's MSJ, App. 577-78; Countercl. ¶¶ 309-14. TriStar maintains that ATC cannot demonstrate that TriStar interfered with a valid contractual provision, because the provisions ATC alleges were violated are invalid as unreasonable restraints on alienation. For the same reasons discussed *supra* in Section IV.B, there is a genuine dispute of material fact with respect to this claim for the reasons there articulated, including, among others, the variations in the terms of the 143 lease agreements at issue. Those same variations prevent the Court from determining as a matter of law that the non-interference and right of first refusal provisions are impermissible restraints on alienation. Further, for the same reasons set out in Section IV.B, the Court concludes there is a genuine issue of material fact as to whether ATC incurred damages resulting from TriStar's alleged tortious interference. Accordingly, TriStar's Motion for Summary Judgment is **DENIED** with respect to ATC's tortious interference with contract counterclaim.

### 2.    Tortious Interference with Business Expectancies

A claim for tortious interference with business expectancies requires: (i) a reasonable probability that the parties would have entered into a contractual relationship; (ii) an intentional and malicious act that prevented the relationship from occurring; (iii) the defendant lacked privilege or justification to do the act; and (iv) resulting damage. *Bryan v. Jones*, No. 2:05-CV-109, 2005 WL 1189882, at *3 (E.D. Tex. May 19, 2005) (citing *Grace v. Zimmerman*, 853 S.W.2d 92, 95 (Tex. App.–Houston [14th Dist.] 1993, no writ)). TriStar's Motion for Summary

Judgment on this counterclaim is based on the contention that ATC improperly seeks damages for 594 sites where TriStar obtained property rights. ATC responds that this claim includes all instances where TriStar allegedly interfered with ATC's contractual relationships, even at 451 sites where no confidentiality provisions are in the applicable leases, because TriStar allegedly misled landowners about its business model and ability to increase revenue to landowners. ATC's Opp. to TriStar's MSJ, App. 57-58 (¶¶ 116, 118, 320-22). ATC claims that TriStar told landowners it would operate towers on the landowners' properties and share a portion of the resulting revenue with them, and that these acts tortiously interfered with their business expectancies. *See infra* Sections V.B and V.C. The Court finds that ATC presented sufficient evidence to raise a genuine issue of material fact as to this issue, and thus TriStar's Motion for Summary Judgment is **DENIED** with respect to ATC's tortious interference with business expectancies counterclaim.

## IV.      TRISTAR INDIVIDUALS' MOTION FOR PARTIAL SUMMARY JUDGMENT

ATC alleges that the TriStar Individuals[11] have violated Sections 1962(c) and 1962(d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), by committing wire and mail fraud when they allegedly induced landowners to sign with TriStar by saying TriStar would operate cell towers on the landowners' property after their leases with ATC expired, and that they would share the revenue from the operation of those towers with the landowners, when in actuality TriStar intended to sell its easements or subcontract operations, not to operate those towers itself. Countercl. ¶¶ 43-57, 116, 173. ATC's theory is essentially that the TriStar Individuals misled landowners to obtain easements on properties under ATC's towers, which TriStar could then use as leverage to demand a buyout of those easements from ATC.

---

[11] The "TriStar Individuals" are current and former TriStar employees.

The TriStar Individuals contend ATC lacks standing to bring such claims. To establish standing under RICO, a claimant must demonstrate causation and injury. *Jackson v. NAACP*, No. 12-20399, 2013 WL 5530576, at *3 (5th Cir. Oct. 8, 2013) (citing *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 606 (5th Cir. 1998)). The causation element requires a showing that that the counter-defendant's conduct "not only was a 'but for' cause of [the claimant's] injury, but the proximate cause as well." *Holmes v. Sec. Investor Prot. Corp.,* 503 U.S. 258, 268, (1992); *Jackson*, 2013 WL 5530576, at *3. In assessing proximate cause, "the central question [courts] must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 461, (2006); *Jackson*, 2013 WL 5530576, at *3. RICO causation also includes an element of reliance. *See Bridgewater v. Double Diamond-Delaware, Inc.*, No. 3:09-cv-1758-B, 2011 WL 1671021, at *11 (N.D. Tex. Apr. 29, 2011) (Boyle, J.) (citing *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 653 (2008)).

The TriStar Individuals maintain that the alleged pattern of racketeering activities did not proximately cause ATC's alleged injuries because TriStar did operate towers, either directly or indirectly, so the representation that it would do so is true, that any harm suffered by ATC is too indirect to satisfy RICO's causation requirement, and that the written easements preclude any reliance by landowners on oral representations by TriStar's representatives.

The TriStar Individuals argue that they did not make any "false promises" to landowners, because if, as ATC alleges, they represented to landowners that TriStar would operate towers on their land and give landowners a portion of the ensuing revenue, TriStar has done so, and thus there were no misrepresentations. The TriStar Individuals present evidence that where ATC leases expired, TriStar is, directly or indirectly, operating cell towers pursuant to its easements, that it has already made upfront payments to landowners totaling more than $50 million, and that

it has paid landowners shares of revenue earned from the operation of its towers totaling more than $1 million. TriStar Indivs.' MSJ, App. 6-8 (Mackey Decl. ¶¶ 5-10).

ATC adduces evidence that TriStar subcontracts the operation of its towers to Crown and SBA, and argues that this subcontracting renders false the representation to landowners that TriStar would operate towers on their land. ATC's RICO Opp., App. 708-09.[12] ATC maintains that except for a "handful of towers" TriStar is not operating its own towers and lacks the "equipment, personnel, and expertise" to do so, thus necessitating its subcontracts with SBA and Crown. ATC's RICO Opp. 35. The record evidence, however, does not support the conclusion, either as a matter of fact or law, that a representation that TriStar would operate towers is rendered false by a subcontract. ATC also asserts that TriStar had no long-term plan to operate the cell towers to which it had acquired rights, but rather had as its overriding goal the acquisition of rights to those sites and their sale back to ATC. ATC's RICO Opp. 35-36, 565 (email from TriStar employee Giles that TriStar "won't be around in 18 months").

The undisputed facts are that TriStar has, either directly or by subcontract, operated the cell towers at issue, and made its contractually required payments to landowners. As a matter of undisputed fact and law, TriStar's discussion of, or planning for, a merger or acquisition with ATC does not make false the statements it made about operating towers. In fact, even if TriStar envisioned it would operate only for a limited time before selling its property interests to ATC, ATC represented to the Court that it would not do business with TriStar, and TriStar has continued to operate towers, either directly or by subcontract. TriStar's hope to make a deal with ATC, when ATC had every right to make or reject such a deal, cannot have proximately caused RICO injuries to ATC. Indeed, ATC's own damages expert bases his damages calculation in part

---

[12] The Court will refer to ATC's opposition to the TriStar Individuals' Motion for Summary Judgment as "ATC's RICO Opp."

on the assumption that TriStar will continue to operate the towers at issue for 40 years beyond

the expiration of the current leases. TriStar Indivs.' MSJ, App. 75 (Besen Dep. 46:4-11). In short,

the Court concludes that the evidence is that TriStar has fulfilled its promises to landowners, and

there is no genuine issue of material fact as to the contrary.

 The TriStar Individuals additionally argue that the causal chain between their conduct

and ATC's alleged injuries is too indirect. The TriStar Individuals maintain that even if the

alleged promises were false, it was the landowners to whom such promises were made, and that

only they, and not ATC, could claim to be directly injured. ATC concedes that its alleged injury

is the result of a "two-step" scheme–fraudulent inducement by the TriStar Individuals to cause

landowners to grant TriStar easements under ATC's towers, followed by a projected offer by

TriStar to sell the easement bundle back to ATC "for an extortionate price." Countercl. ¶¶ 2,

233e, 237. ATC maintains that this alleged chain of events is sufficiently direct to satisfy RICO's

causation requirement.

 With respect to this facet of the causation inquiry, *Anza v. Ideal Steel Supply Corp.*, 547

U.S. 451, 454 (2006), is instructive. In *Anza*, the plaintiffs alleged that the defendant did not

charge sales tax to its cash-paying customers, in order to gain a competitive advantage over

plaintiffs, and that defendant filed fraudulent tax returns to conceal its conduct. The plaintiffs

asserted that they were harmed by lost sales due to defendant's lower prices. The Supreme Court

held that only the New York tax authority, with which the fraudulent tax returns were filed, was

directly harmed, and that the plaintiffs' alleged harms were too attenuated and involved too

many other factors to satisfy the causation requirement of RICO. *Id.* at 457-58.

 Here, as in *Anza*, there are a myriad of factors that could have resulted in ATC's claimed

injuries–*e.g.*, paying higher prices to renew its leases–including market conditions and non-

fraudulent bases as to why TriStar's offers appealed to landowners. *Id.* at 460 (noting that the proximate cause inquiry under RICO has "particular resonance when applied to claims brought by economic competitors, which, if left unchecked, could blur the line between RICO and the antitrust laws"). Even though ATC argues that it was put at a competitive disadvantage due to the TriStar Individuals' conduct, "[a] RICO [claimant] cannot circumvent the proximate-cause requirement simply by claiming that the defendant's aim was to increase market share at a competitor's expense." *Id.* at 460-61. While ATC presented evidence that TriStar had an interest in selling property interests back to ATC, the indirect nature of the claimed injuries, as well as the multitude of other factors that could have caused or affected those injuries, attenuates the causal connection to RICO as a matter of law.

Alternatively, even if ATC could otherwise satisfy the proximate cause aspect of RICO, it cannot satisfy the reliance element. To succeed on its RICO counterclaim, ATC must prove that it or the landowners, as third-parties, relied on the alleged false promises made by the TriStar Individuals. *Bridgewater v. Double Diamond-Delaware, Inc.*, No. 3:09-cv-1758-B, 2011 WL 1671021, at *11 (N.D. Tex. Apr. 29, 2011) (Boyle, J.) (holding that while a RICO claimant alleging injury by reason of a pattern of mail fraud need not demonstrate that it relied on the misrepresentations at issue, such a claimant cannot prevail "without showing that *someone* relied on the . . . misrepresentations") (emphasis in original). ATC presents evidence that landowners considered the TriStar Individuals' representations in deciding to enter into a transaction with TriStar. *See* ATC's RICO Opp., App. 635-39 (landowner testifying that the revenue sharing provision was the most important part of TriStar's offer and that she understood TriStar would itself operate the tower on her land); *see also id.* at 676-77 (landowner choosing TriStar based on the "money aspect"), 701-02 (landowner believed TriStar would be operating the tower on his

property). ATC also presents evidence that TriStar itself understood landowners to be relying on the representations of TriStar employees. ATC's RICO Opp., App. 631-32 (TriStar executive stating at deposition that he thinks landowners believed TriStar's statements about operating towers "because they signed with [TriStar]").

However, although for this analysis the Court must assume that the import of the TriStar Individuals' statements to landowners was that TriStar would itself operate the towers on their land, the agreements TriStar entered into with landowners permit TriStar to unilaterally terminate or assign these agreements, without notice to the landowners. *See, e.g.*, TriStar Indivs.' MSJ, App. 7-8 (¶ 10), 240. TriStar argues that any oral representations that TriStar would operate the towers are flatly contradicted by the agreements signed by the landowners, and that reliance on such representations is thus abrogated as a matter of law. *Boggan v. Data Sys. Network Corp.*, 969 F.2d 149, 153 (5th Cir. 1992); *Guardian Life Ins. Co. v. Kinder*, 663 F. Supp. 2d 544, 553 (S.D. Tex. 2009) (holding that "reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law").

ATC argues that TriStar's cited authority is inapposite, given that in *Dunbar Medical Systems., Inc., v. Gammex, Inc.*, 216 F.3d 441, 453 n.15 (5th Cir. 2000), the Fifth Circuit declined to apply *Boggan* on the grounds that it was decided in part upon a finding that the statements involved were not actionable misrepresentations. ATC argues that "promises made with no intention of performing" are actionable under RICO without regard to the contract. *Id.* However, cases in addition to *Boggan* stand for the proposition that persons, such as the landlords, may not justifiably rely on statements made in negotiations that are contrary to the

written terms of a contract. *See Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 214 n.23

(5th Cir. 2009); *Guardian Life Ins. Co.*, 663 F. Supp. 2d at 553.

Therefore, because ATC cannot show actionable false statements or causation under

RICO, the Court **GRANTS** the TriStar Individuals' Motion for Summary Judgment on ATC's

RICO counterclaims.

## V.      ATC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

ATC seeks summary judgment on TriStar's claims for monopolization under Section 2 of

the Sherman Act, false advertising under Section 43(a) of the Lanham Act, and tortious

interference with prospective business relations. ATC also seeks summary judgment that TriStar

may seek damages only on a limited number of sites.

### A.      Sherman Act Section 2

While Section 1 of the Sherman Act applies to activity between two or more persons that

raises antitrust concerns, Section 2 of the Sherman Act applies to unilateral activity. 15 U.S.C. §

2. Specifically, Section 2 proscribes steps taken to monopolize, attempt to monopolize, or

conspire to monopolize a particular market. To prevail on a claim of monopolization under

Section 2, a plaintiff must demonstrate that the defendant possesses monopoly power in the

relevant market, and that the defendant willfully acquired or maintained that power, rather than

developed it as a consequence of a superior product, business acumen, or historical accident.

*Eastman Kodak Co. v. Image Tech Servs., Inc.*, 504 U.S. 451, 481 (1992); *United States v. Am.

Airlines, Inc.,* 743 F.2d 1114, 1117 (5th Cir. 1984) (citing *United States v. Grinnell Corp.,* 384

U.S. 563, 570–71 (1966)). The related claim of attempted monopolization has three elements:

that (1) the defendant engaged in predatory or exclusionary conduct; (2) the defendant possessed

the specific intent to monopolize; and (3) there was a dangerous probability that the defendant

would succeed in his attempt. *Bell Atl. Corp. v. AT & T Corp.,* 339 F.3d 294, 302 (5th Cir. 2003) (citing *Taylor Pub. Co. v. Jostens, Inc.,* 216 F.3d 465, 474 (5th Cir. 2000)).

### 1.    Market Definition

To succeed on a claim for monopolization under Section 2, a plaintiff must show that the defendant had market power, defined as the ability to raise prices or exclude competition in the relevant market. *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391(1956). To determine the relevant market, courts must determine both the relevant product market and the relevant geographic market. *Apani Sw., Inc. v. Coca–Cola Enters., Inc.,* 300 F.3d 620, 626-28 (5th Cir. 2002); *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.,* 123 F.3d 301, 312 (5th Cir. 1997) (determining the relevant market as a matter of law); *O'Dell v. Gen. Motors Corp.*, 122 F. Supp. 2d 721, 734 (E.D. Tex. 2000).

Here, the parties disagree as to both the relevant product market and the relevant geographic market. TriStar asserts that the relevant product market is the market for cell tower operation, both nationally and in single-site geographic submarkets for each tower site that ATC "currently controls or seeks to control[,]" asserting that "[e]ach cell tower is an economically distinct market . . . ." Second Am. Compl. ¶ 162-63). In contrast, ATC maintains that the relevant market is the national market for land rights under cell towers. TriStar's Sherman Act Section 2 claim focuses on ATC's actions with respect to acquisitions of property rights, and TriStar's expert testified that the relevant product market was for future land rights. ATC's MSJ, App. 3303-14 (Perryman Dep. 153:21-25, 154:11-18, 155:4-23, 282:21-283:5). The thrust of TriStar's claim centers on acquisitions of property interests that TriStar alleges ATC is unreasonably restraining. The Court concludes that property interests at cell tower sites, rather than tower operation, is the relevant product market.

With respect to the proper geographic market, TriStar's submarket definition would establish more than 135,000 separate markets, with nearly 3,000 single-site markets at issue here. TriStar's submarket definition would fragment the relevant geographic market to the point of absurdity. *See Jayco Sys., Inc. v. Savin Bus. Mach. Corp.*, 777 F.2d 306, 320 (5th Cir. 1985) ("As a matter of common sense a single purchaser of a product cannot generally be considered a relevant market, lest we wish to clothe each and every sale with an antitrust suit.") Indeed, if each individual tower site were its own geographic market, then any possessor of land rights at an individual tower site would be a monopolist. Instead, the appropriate scope of the market is nationwide. Cell tower sites are interrelated and have increased value when they are part of a greater network that provides reliable cell coverage. *See* TriStar's MSJ, App. TS225. The Court concludes that the relevant geographic market for the purposes of TriStar's Sherman Act Section 2 claim is the national market.

### 2.      Market Share

A plaintiff must show that a defendant had a legally significant share of the market to establish monopolization or attempted monopolization under Section 2 of the Sherman Act. *C.A.T. Indus. Disposal, Inc. v. Browning-Ferris Indus., Inc.*, 884 F.2d 209, 211 (5th Cir. 1989); *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480, 489 (5th Cir. 1984); *Benson v. St. Joseph Reg'l Health Ctr.*, No. H-04-4323, 2007 WL 7120757, at *11-12 (S.D. Tex. Mar. 22, 2007) *aff'd*, 575 F.3d 542 (5th Cir. 2009). ATC presents evidence that it has a market share of approximately 17% of the current market for property rights.[13] ATC's MSJ, App. 12. While there is no fixed percentage of the market that a defendant must control to be found liable under Section 2, the Fifth Circuit has stated that, "absent special circumstances, a defendant must have

---

[13] ATC owns roughly 22,800 tower sites out of 135,000 national sites. ATC's MSJ, App. 12.

a market share of at least fifty percent before he can be guilty of monopolization." *Domed*

*Stadium Hotel,* 732 F.2d at 490; *Benson*, 2007 WL 7120757, at *11-12. Given the Court's

definition of the market, ATC's share thus cannot implicate Section 2 as a matter of law. Further,

with respect to TriStar's attempted monopolization claim, the Court finds that there is no

dangerous probability that ATC will successfully monopolize the national market, given its

market share and the robust competition provided by at least TriStar, Crown, and SBA in the

national market. Therefore, ATC's Motion for Summary Judgment is **GRANTED** with respect

to TriStar's claims under Section 2 of the Sherman Act.

**B.      Lanham Act**

To establish a claim for false advertising under Section 43(a) of the Lanham Act, a

plaintiff must show: (1) a false or misleading statement of fact in connection with goods or

services; (2) that either deceived or had the capacity to deceive a substantial segment of potential

consumers; (3) where the deception was material, in that it was likely to influence a consumer's

purchasing decision; (4) the product was in interstate commerce; and (5) the plaintiff was or is

likely to be injured as a result of the statement at issue. 15 U.S.C. § 1125(a)(1)(B); *GoForIt*

*Entm't, LLC v. DigiMedia.com L.P.*, 750 F. Supp. 2d 712, 743 (N.D. Tex. 2010) (Fitzwater,

C.J.).

ATC argues that TriStar's Section 43(a) claim fails as a matter of law because any

allegedly false statements it made were in connection with its efforts to obtain real property

rights, rather than goods or services. However, in its Responses to TriStar's Requests for

Admission, ATC conceded that it "provides services to landowners in interstate commerce" and

"services to wireless carriers in interstate commerce." TriStar's Opp. to ATC's MSJ, App. 2187

(#58 & #59). The Court concludes based on the record facts and this admission that ATC's

statements to landowners were sufficiently connected to services to landowners and carriers to support a Lanham Act claim.

ATC also argues that any representations it made fall outside the bounds of a Section 43(a) claim because they were made to suppliers, *i.e.*, landowners supplying property, rather than to purchasers, *i.e.*, wireless carriers renting space on its towers, and thus that they could not prompt a change in purchasing behavior, which is what the Lanham Act was designed to prevent. *Seven-Up Co. v. Coca-Cola Co.,* 86 F.3d 1379, 1384 (5th Cir. 1996) (stating that the requirements for establishing "commercial advertising or promotion" under Section 43(a) of the Lanham Act included that the representations be "for the purpose of influencing consumers to buy defendant's goods or services" and "disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry") (citing *Gordon & Breach Sci. Publishers v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1532 (S.D.N.Y. 1994)); *see also Transcom Enhanced Servs., Inc. v. Qwest Corp.*, No. 4:09-CV-755-A, 2010 WL 2505606, at *4-5 (N.D. Tex. June 18, 2010) (McBryde, J.) (dismissing a false advertising claim because the communications in question were not for the purpose of "influenc[ing] customers to buy the defendants' goods or services").

In this case, the Court concludes that landowners may be properly characterized as consumers for purposes of TriStar's Lanham Act claim. TriStar presented evidence that the communications between ATC and landowners concede such a relationship. *See, e.g.*, TriStar's Opp. to ATC's MSJ, App. 861 (ATC's mailing to a landowner, describing a commitment to being a "quality service provider for our customers and those companies and partners like you" and stating that "ATC must maintain relationships with both landowners and wireless carriers to operate"). The analysis in *Health Care Compare Corp. v. United Payor & United Providers,*

*Inc.*, No. 96-C-2518, 1998 WL 122900, at *3 (N.D. Ill. Mar. 13, 1998) is persuasive on this issue. In *Health Care Compare*, a health care network offered a means of connecting insurance companies ("payors") with hospitals ("providers"). The defendant network argued that its relationship with providers could not constitute a basis for a Lanham Act claim because the payors (employers and health insurance companies who purchased discounted services through the network) were the true "consumers" of its services, rather than the providers (doctors and hospitals who agreed to provide health-related services at a discount through the network). The court rejected this argument on the grounds that the defendant's business could not succeed unless both payors and providers were convinced to use defendant's services "with [defendant] providing each with access to the other." *Id.* Accordingly, where an entity is not a traditional "purchaser", statements to that entity may still be actionable under the Lanham Act if that entity is essential to the defendant's ability to meet the needs of the entities that purchase its goods or services.

Here, the Lanham Act applies to ATC's statements to landowners because ATC requires property rights from those landowners to do business with the wireless carriers, and accordingly, the importance of these property rights to ATC's business relationship with wireless carriers places ATC's statements to landowners properly within the bounds of a claim under the Lanham Act. *See* TriStar's Opp. to ATC's MSJ, App. 861 (letter from ATC executive to landowner stating that agreements with landowners help ATC "to meet [its] customer commitments"); 870 (ATC email emphasizing the importance of a "long term secure location for [its] network" to ATC customers). Without property on which to locate its towers, ATC could not obtain its major source of revenue–the lease of space on towers to wireless carriers like AT&T, Verizon, and T-Mobile. ATC's MSJ, App. 810. Finally, ATC's own Lanham Act counterclaim for false

advertising closely tracks TriStar's claim, and thus ATC's arguments against TriStar's claim would similarly impugn its own allegations. The Court concludes that ATC's relationship with landowners suffices for TriStar to state a claim under Section 43(a) of the Lanham Act, and ATC's Motion for Partial Summary Judgment is thus **DENIED** as to TriStar's Lanham Act claim.

## C.    Tortious Interference with Prospective Business Relations

The elements of a claim for tortious interference with a prospective business relationship are: (1) a reasonable probability that the parties would have entered into a contractual relationship; (2) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring; (3) the defendant did that act with a conscious desire to prevent the relationship from occurring or knew that the interference was certain or substantially certain to occur as a result of his conduct; and (4) the plaintiff suffered actual harm or damage as a result of the defendant's interference. *DT Apartment Grp., LP v. CWCapital, LLC*, No. 3:12-CV-0437-D, 2012 WL 6693192, at *13 (N.D. Tex. Dec. 26, 2012) (Fitzwater, C.J.) (citing *Faucette v. Chantos*, 322 S.W.3d 901, 914 (Tex. App.—Houston [14th Dist.] 2010, no pet.)). A plaintiff need not prove that a contract would have been made but for the interference, but must demonstrate that a contractual relationship was "reasonably probable, considering all the facts and circumstances attendant to the transaction." *Milam v. Nat'l Ins. Crime Bureau*, 989 S.W.2d 126, 132 (Tex. App.—San Antonio 1999, no pet.).

ATC argues that TriStar has not presented evidence that it was reasonably probable that TriStar would have entered into a contractual relationship with specific landowners but for ATC's conduct. *Milam*, 989 S.W.2d at 132 (holding that "mere negotiations" do not suffice to show reasonable probability of a contractual relationship). TriStar's evidence is comprised of

testimony from landowners, ATC, and TriStar witnesses who worked with landowners, as well as from ATC documents, that certain landowners were likely to enter into agreements with TriStar but for ATC's conduct. *See, e.g.*, TriStar's Opp. to ATC's MSJ, App. 55-56 (Account of ATC's "TriStar Block Sale Script" from an ATC representative), 1019 (email from ATC lease consultant stating that he has "dirt mouthed [TriStar] so badly I think [the landowner] is convinced that it is not the way to go"), 1496-1691 (excerpts of TriStar site communication logs reflecting communications from ATC), 1954-58 (25:1-27:12, 40:5-41:20) (landowner testifying that ATC's statements prompted her to "back[ ] off" and that she would have signed with TriStar had ATC never made statements about moving tenants or tearing down the tower on her property). The Court finds that TriStar has raised a genuine issue of material fact as to whether there was a reasonable probability that certain landowners would have entered into agreements with it but for ATC's allegedly wrongful conduct.

ATC also argues that TriStar cannot satisfy the independent tort requirement for its tortious interference with prospective business relationship claim. To satisfy this requirement, a claimant must present evidence that the defendant committed an act that is independently tortious or unlawful beyond the fact that it prevented a contractual relationship from occurring. *DT Apartment Grp., LP*, 2012 WL 6693192, at *13. Given that the Court has denied ATC's motion for summary judgment with respect to TriStar's Lanham Act claim, TriStar has at least one claim, if proven at trial, that would satisfy the independent tort requirement, thereby precluding summary judgment on these grounds. Therefore, ATC's Motion for Partial Summary Judgment is **DENIED** with respect to TriStar's tortious interference with prospective business relations claim.

D.     **Damages**

TriStar's claims are based on the allegation that ATC made false statements about TriStar to landowners of sites under ATC towers, in an attempt to discourage those landowners from conveying property rights to TriStar, resulting in TriStar losing property rights or overpaying to secure relationships with landowners. TriStar argues, based on ATC's conduct, that it was injured with respect to 278 of the 2,944 sites where ATC and TriStar competed for property rights. TriStar's Opp. to ATC's MSJ 49 n.82 ("TriStar seeks damages for the loss of only 278 [sites]."); ATC's MSJ, App. 831 (Perryman Report ¶61) ("[M]y analysis focuses on the 2,944 sites at which TriStar has made offers to landowners to acquire rights under the tower operated (or formerly operated) by [ATC]."). ATC argues, however, that at best, TriStar has presented sufficient evidence that it lost property to ATC or paid more to secure a property interest because of ATC's actions at 28 sites. ATC's MSJ, App.  2790, 2799-801, 3317, 3320. ATC maintains that any damages TriStar recovers should be limited to those it incurred with respect to those 28 sites.

ATC criticizes the conclusion of TriStar's expert, Dr. Perryman, that, based on his review of the damages TriStar allegedly suffered at those 28 sites, he can extrapolate that similar conduct by ATC occurred and caused similar outcomes at 278 sites. ATC's MSJ, App. 802-966 (Perryman's Report). Dr. Perryman charted the "number of incidents of misconduct per year" by ATC from 2007-2012. ATC's MSJ, App. 905-06 (Perryman Report ¶ 174). He also calculated TriStar's two-year "close rate" over this time period, *i.e.* the ratio between the number of offers that TriStar made and the number of agreements TriStar secured within two years of an offer. *Id.* Dr. Perryman observed that as the number of incidents of misconduct by ATC increased, TriStar's close rate decreased, despite the fact that TriStar increased its marketing expenditures

and, in his view, TriStar's offers were superior to ATC's. Dr. Perryman concluded that there was a statistically significant correlation between the drop in TriStar's success in closing deals with landowners and allegedly improper acts of ATC.

Dr. Perryman used a regression analysis to estimate the number of sites at which TriStar would have been successful in acquiring property rights with and without misconduct by ATC. ATC's MSJ, App. 929-031 (Perryman Report ¶¶ 240-45, 260-62). Comparing these two numbers, Dr. Perryman concluded that TriStar would have acquired rights at 278 sites but for ATC's misconduct. ATC argues that this does not constitute "direct evidence", because Dr. Perryman's analysis does not refer to specific sites where TriStar has been harmed by ATC's conduct, and that a claimant cannot demonstrate the fact of such damage through extrapolation and statistical analysis. However, TriStar argues that Dr. Perryman's use of the regression analysis and calculations therefrom is sufficient, at the summary judgment stage, to demonstrate damages on TriStar's Lanham Act and tortious interference claims.

The Court concludes that TriStar has presented "sufficient evidence from which [a] jury could . . . infer[] that [it] was in some way injured" as to its Lanham Act & tortious interference claims. *Logan v. Burgers Ozark Country Cured Hams Inc.*, 263 F.3d 447, 463 (5th Cir. 2001); *Meza v. Serv. Merch. Co., Inc.,* 951 S.W.2d 149, 152 (Tex. App.—Corpus Christi 1997, pet. denied) (holding that with respect to tortious interference "any ultimate fact may be proven by circumstantial evidence"). While TriStar may not ultimately to be able to prove that it was damaged beyond the 28 sites where ATC concedes it has offered direct evidence as to its injuries, Dr. Perryman's regression analysis, the statements from landowners, and the decline in TriStar's success rate in acquiring interests provide a sufficient basis for a jury to conclude that TriStar was injured at the 278 sites. *See* TriStar's Opp. to ATC's MSJ, App. 1878-79 (landowner

testifying that an ATC representative described TriStar's method of operation as "highway robbery" and that the company was a "dirty, rotten, stinking outfit"), 1932-33 (29:23-31:14, 32:10-14) (deposition testimony from a landowner stating that ATC's statements left him "no options" but to stop "entertaining the thought of anything else other than [ATC]"), 2070-105 (Perryman Report ¶¶ 179-255, 257-65). Therefore, ATC's Motion for Partial Summary Judgment is **DENIED** as to TriStar's alleged damages for its Lanham Act and tortious interference claims.

## VI.      CONCLUSION

For the foregoing reasons, TriStar's Motion is **GRANTED** and ATC's Motion is **DENIED** on ATC's Sherman Act Section 1 counterclaim, and TriStar's Motion is **DENIED** on ATC's trade secret and tortious interference counterclaims. The TriStar Individuals' Motion is **GRANTED** on ATC's RICO counterclaims. ATC's Motion is **GRANTED** on TriStar's Sherman Act Section 2 claim, and **DENIED** on TriStar's Lanham Act and tortious interference with prospective business relations claims. A separate judgment will be entered dismissing ATC's Sherman Act Section 1 and RICO counterclaims, and TriStar's Sherman Act Section 2 claim.

**SO ORDERED**.

April 3, 2014.

BARBARA M. G. LYNN
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF TEXAS